UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| JUANITA RATLIFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-CV-142-KAC-HBG |
| | ) | |
| ETHICON, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Defendants' Motion to Limit the Case-Specific Opinions of Bruce Rosenzweig, M.D. ("Motion to Limit") [Doc. 83] and Plaintiff's Motion to Exclude Certain Opinions and Testimony of Steven Edwin Speights, M.D. ("Motion to Exclude") [Doc. 85]. The parties appeared before the undersigned on July 2, 2021, for a motion hearing. Attorney Adam Davis was present on behalf of Plaintiff. Attorneys Amy Pepke and Kari Sutherland appeared on behalf of Defendants. Accordingly, for the reasons discussed below, the Court **GRANTS IN PART AND DENIES PART** Defendants' Motion to Limit [**Doc. 83**] and **DENIES** Plaintiff's Motion to Exclude [**Doc. 85**].

**I.    BACKGROUND**

On March 4, 2008, Plaintiff underwent an operation at Sycamore Shoals Hospital in Elizabethton, Tennessee, performed by Dr. Laing to implant a medical device, Prolift ("Device"). [Doc. 1]. Plaintiff alleges that she sustained various injuries as a consequence of the Device, including pelvic and vaginal pain and urinary dysfunction. Plaintiff has pending claims against

Defendants for negligence, strict liability for failure to warn, strict liability for defective product, strict liability for design defect, common law fraud, fraudulent concealment, constructive fraud, negligence misrepresentation, negligent infliction of emotional distress, breach of express and implied warranty, gross negligence, punitive damages, and discovery rule and tolling. *See* [Doc. 1].

Relevant to the instant matter, Plaintiff has retained Bruce Rosenzweig, M.D., a urogynecologist, to provide case-specific expert testimony. Defendants have retained Steven Edwin Speights M.D., a urogynecologist, to provide expert opinions in this matter. Each party has challenged the opposing party's expert's opinions.

## II. STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993)). Specifically, Rule 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

2

Fed. R. Evid. 702.

In *Daubert,* the Supreme Court of the United States stated that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The *Daubert* standard "attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony, include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970-71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94). Rule 702 inquiry as "a flexible one," and the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138-39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cty., Tenn.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138-39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in

3

the case." *Coffey*, 187 F. Supp. 2d at 70-71 (quoting *Daubert*, 509 U.S. at 593-94). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10. Moreover, the Supreme Court has explained that in determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue." *Id.* at 592–93. "Furthermore, the court must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used." *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *7 (E.D. Pa. Feb. 1, 2001) (citing *Heller,* 167 F.3d at 153).

Further, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." *In re Diet Drugs*, 2001 WL 454586, at *7 (quoting 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000)). This simply means that "a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *Id.* (other citations omitted). Finally, "the court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Group*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. Dec. 4, 2017) (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009)) (other quotations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

4

Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at 840 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)).

## III. ANALYSIS

The Court has considered the parties' positions and the oral arguments presented at the hearing. Accordingly, for the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Limit [**Doc. 83**] and **DENIES** Plaintiff's Motion to Exclude [**Doc. 85**].

The Court will first address Defendants' challenges to Dr. Rosenzweig's opinions and then turn to Plaintiff's challenges to Dr. Speights's opinions.

### A. Dr. Rosenzweig

Defendants assert five challenges to Dr. Rosenzweig's testimony. First, Defendants argue that Dr. Rosenzweig's opinions regarding alternatives to the Device should be excluded as they do not constitute safer alternative designs. Second, Defendants argue that Dr. Rosenzweig's opinions concerning degradation, deformation, and other alleged characteristics of the Device should be excluded. Third, Defendants state that Dr. Rosenzweig should not be allowed to speculate on what Plaintiff's implanting physician knew prior to surgery. Fourth, Defendants argue that Dr. Rosenzweig cannot render any legal conclusions. Finally, Defendants assert that Dr. Rosenzweig cannot testify as to the reasonableness and necessity of Plaintiff's medical charges.

The Court will consider these challenges separately.

#### 1. Alternatives to the Device

Defendants argue that Dr. Rosenzweig's opinions regarding alternatives to the Device should be excluded because he identifies procedures and not safer alternative designs. Specifically, Defendants state that Dr. Rosenzweig offers five alternatives but the first four are

5

procedures. Defendants state that Plaintiff is not required to present proof of an alternative design under Tennessee law, but should she choose to do so, the proof must be relevant, citing to *King v. Danek Medical, Inc.*, 37 S.W.3d 429 (Tenn. Ct App. 2000). Defendants argue that the MDL court precluded another expert from offering a similar opinion and numerous courts are in accord.

Plaintiff agrees that Tennessee law does not require her to prove the existence of a safer alternative design in order to establish a prima facie case under the Tennessee Products Liability Act. Plaintiff argues that Dr. Rosenzweig's proposed alternatives are relevant for other reasons. For example, Plaintiff contends that the availability of the non-mesh alternatives is relevant to the consumer expectations test under Tennessee law and is relevant to determine whether Ethicon exercised reasonable care in putting the Device on the market. Plaintiff also asserts that Dr. Rosenzweig has offered several products as safer alternatives, citing to items three through five.

Defendants reply that Plaintiff has not established that the alternatives suggested by Dr. Rosenzweig are medical devices or designs. Defendants argue that alternative procedures are directed at the physician's choice of treatment and not the Device at issue. Defendants argue that items three and four are surgical procedures because they require open abdominal surgery. In addition, Defendants state that Repliform (item 3) is tissue from other human and is regulated differently from the Device here.

In the present matter, Dr. Rosenzweig opined as follows:

> Safer alternative designs, rather than the Prolift polypropylene mesh product, existed for this patient. I have experience with many of these safer alternative designs, an based on my experience and review of medical literature and other materials, it is my opinion that these alternative designs were safer and feasible for Ms. Ratliff. These safer alternative designs include:
>
> (1) The use of sutures, including delayed absorbable sutures like PDS, in a uterosacral ligament suspension and a sacrospinous fixation, a

6

> colporrhaphy or an abdominal sacrocolpopexy with mesh or biologic products;
>
> (2) Fascia POP repair with Biologics;
>
> (3) Repliform cadaveric fascia POP repair;
>
> (4) a POP repair which does not employ the use of polypropylene mesh arms, such as those discussed in options 1-3 above; and
>
> (5) A POP repair utilizing a lighter weight, larger pore mesh which does not employ the use of polypropylene mesh arms.

[Doc. 83-2 at 35]. Dr. Rosenzweig continues, "These safer alternative designs would have significantly reduced the risk of the injuries to Ms. Ratliff, as I have described in my report, that were a result of the specific design flaws of the total Prolift, including erosion, banding, scarring, cording, scar plate, chronic inflammation, chronic foreign body reaction, dense, heavy, and frayed, rough edges." [*Id.*]. Dr. Rosenzweig concludes, "If any of these safer alternative designs had been used for Ms. Ratliff, she would not have suffered the injuries I set forth in my report, as her injuries were caused by the specific design flaws of the total Prolift discussed above." [*Id.*].

As mentioned above, Defendants object to the above testimony, arguing that it is irrelevant because Dr. Rosenzweig offers different procedures and not designs, and Plaintiff responds that such testimony is relevant for other purposes. As an initial matter, the Court notes that the parties agree that under the Tennessee Products Liability Act, Plaintiff is not required to prove the existence of an alternative design. Plaintiff insists that Dr. Rosenzweig's opinion is relevant to the utility of the design.

The Tennessee Products Liability Act states, in part, as follows, "A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it

7

left the control of the manufacturer or seller." Tenn. Code Ann. § 29-28-105(a). In determining if a product is defective or unreasonably dangerous, "Consideration is given also to the customary designs, methods, standards, and techniques of manufacturing, inspecting, testing by other manufacturers or sellers of similar products." Tenn. Code Ann. § 29-28-105(b).

The Court finds evidence of other procedures, as opposed to designs, irrelevant and confusing to the jury. *Hosbrook v. Ethicon, Inc.*, No. 3:20-CV-88, 2021 WL 1599199, at *4 (S.D. Ohio Apr. 23, 2021) ("To introduce evidence of alternative surgical procedures in a product liability case is irrelevant and would create confusion for the jury."). The Court agrees with Defendants that offering alternative procedures takes issue with Plaintiff's physician's treatment choices as opposed to the alleged issues with the Device. *See Willet v. Johnson & Johnson*, 465 F. Supp. 3d 895, 907 (S.D. Iowa 2020) ("The choice of a surgery over a device is a matter of medical judgment of treating doctors, not whether there is a safer alternative design for the product.").

In support of her position, Plaintiff argues that both alternative procedures and designs are relevant to the risk-utility test utilized in Tennessee. The Tennessee Products Liability Act provides for two tests to determine whether a product is unreasonably dangerous: the consumer expectation test and the prudent manufacturer test. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 282 (Tenn. 2005). The Court does not find evidence of alternative procedures relevant to either test for the reasons described above. *Id.* The Court also finds such evidence misleading and confusing in a products liability case.

In this case, the parties also dispute whether Dr. Rosenzweig has provided products. Specifically, Plaintiffs state that items three through five are designs, while Defendants argue that one through four are procedures. During the motion hearing, Defendants explained that a native

8

tissue repair is a procedure because a physician simply attaches the tissue with sutures. In addition, Defendants explained that slings can either be made with the patient's own tissue (autologous slings) or with tissue from a cadaver (allograft slings). Defendants stated that these slings are not similar to the syntenic mesh at issue and the slings are regulated differently. The Court will not preclude Dr. Rosenzweig from testifying about slings, including Repliform. The Court finds that the slings are relevant to the risk-utility analysis and that the differences between the Device at issue and the slings are facts that the jury should consider. In support of their position, Defendants rely on *King*, wherein the Tennessee Court of Appeals granted summary judgment to defendant on plaintiff's claim that a product was unreasonably dangerous, stating that the expert did not propose an alternative design but instead recognized dissimilar devices that did not use pedicle screws. 37 S.W.3d at 449. The Court notes, however, that *King* was decided on a dispositive motion, and here, the question is simply whether a product using non-syntenic material is relevant to the risk-utility analysis. The Court finds that it is relevant for the jury to consider. Accordingly, the Court finds Defendants' argument well taken in part, and the Motion on this issue is **GRANTED IN PART AND DENIED IN PART.**

2. **Characteristics of the Device**

Defendants state that Dr. Rosenzweig opines that a number of defects in the Device caused Plaintiff to experience her symptoms, but he fails to point to any evidence in the record that Plaintiff's Device had any of the characteristics. Defendants assert that Dr. Rosenzweig never examined Plaintiff or her mesh. Defendants state that the MDL court rejected Dr. Rosenzweig's specific causation opinions on similar facts. Defendants state that Dr. Rosenzweig's opinions are inadmissible conjecture.

9

Plaintiff responds that Dr. Rosenzweig performed a differential diagnosis, which courts have routinely upheld as reliable, including the MDL court, which held that the allegations of an improper differential diagnosis are best addressed on cross examination. Plaintiff states that Dr. Rosenzweig described Plaintiff's medical history in detail and why he ruled out causes other than the mesh for her injuries. Further, Plaintiff states that one of her physicians observed the banding effect and scarring. Plaintiff states that Dr. Rosenzweig also explained his differential diagnosis during his deposition as it relates to her dyspareunia.

Defendants reply that Dr. Rosenzweig cannot opine that Plaintiff's Device underwent certain deformations in the absence of any forensic evidence. Defendants maintain that Dr. Rosenzweig has no basis to claim that Plaintiff's Device sustained degradation, contraction, or any other deformation.

Specifically, in the present matter, Defendants object to Dr. Rosenzweig's opinion that Plaintiff's symptoms were caused by the erosion of the mesh, degradation of the mesh, chronic inflammation and chronic foreign body reaction, mesh that was never meant to be implanted inside the human body and is incompatible with the naturally occurring condition of the vagina, including peroxides and bacteria, deformation, mesh banding, rigidity, fraying, roping, cording, and curling of the mesh, loss of pore size with tension, fibrotic bridging leading to scar plate formation and mesh encapsulation, shrinkage/contraction of the encapsulated mesh, and the difficulty and/or impossibility of removing the devices of the Prolift device. [Doc. 83-2 at 32-33].

In addition, in his expert report, Dr. Rosenzweig explains Plaintiff's medical history. [*Id.* at 4-29]. Dr. Rosenzweig states that in forming his opinions, he conducted a broad differential diagnosis, taking into consideration Plaintiff's medical and surgical history. [*Id.* at 30]. Dr.

Rosenzweig further explains how he was able to rule in the total Prolift mesh device as the cause of Plaitniff's symptoms, stating as follows:

> I was able to rule in the total Prolift mesh device as the cause of Ms. Ratliff's recurrent UTIs, sepsis, frequency, hematuria, hydroureteronephrosis, neurogenic bladder, thickened bladder wall, low volume bladder, OAB, bladder spasms, incomplete bladder emptying with the need for chronic Foley, dysuria, chronic kidney failure, chronic pelvic pain, chronic vaginal pain, dyspareunia, and vaginal scarring. Ms. Ratliff did not experience these symptoms until after the total Prolift implant. Post implant, she experienced chronic UTIs, dysuria and hematuria. It was observed that her bladder had inflamed mucosa. She developed a thickened bladder wall and experienced urinary dysfunction as a result, including hydroureteronephrosis, chronic kidney failure, and the need for a chronic Foley and nephrostomy tubes and ureteral stents. Dr. Box documented that both Ms. Ratliff and her partner felt a band effect in her vagina, and Dr. Box observed the band effect on exam. Dr. Box also observed vaginal scarring on exam. He also noted a narrowing and shortening of her vagina due to the repairs. Dr. Olsen observed eroded mesh in Ms. Ratliff's vagina and determined that it was the Prolift device. This eroded mesh necessitated the removal surgery.

[*Id.* at 31]. Dr. Rosenzweig then explains why he was able to rule out Plaintiff's preexisting conditions as the cause of her injuries. [*Id.* at 31-32].

The Court finds Defendants' objections go to the weight of Dr. Rosenzweig's testimony, rather than to its admissibility. Defendants argue that Dr. Rosenzweig failed to point to any evidence in the record that Plaintiff's Device had any of the characteristics listed above and that he never examined Plaintiff or the mesh. The Court finds that the lack of an examination is not fatal to Dr. Rosenzweig's opinions. As he explained in his report, Dr. Rosenzweig reviewed Plaintiff's medical history and performed a differential diagnosis. The Sixth Circuit Court of Appeals has held that a "medical-causation opinion in the form of a doctor's differential diagnosis is reliable and admissible, where the doctor: (1) objectively ascertains, to the extent possible, the

nature of the patient's injuries; (2) 'rules in' one or more causes of the injury using a valid methodology; and (3) engages in 'standard diagnostic techniques by which doctors normally rule out alternative causes' to reach a conclusion as to which cause is most likely." *Best v. Lowe's Home Centers, Inc.,* 563 F.3d 171, 179 (6th Cir. 2009) (quoting *In re Paoli Railroad Yard PCB Litig.,* 35 F.3d 717 (3d Cir. 1994)). Accordingly, the Court finds Dr. Rosenzweig's opinion reliable.

Further, the Western District of Texas addressed similar arguments regarding Dr. Rosenzweig's opinions. *Meindertsma v. Ethicon Inc.*, No. 1:20-CV-00708-RP, 2021 WL 2010355, at *7 (W.D. Tex. May 17, 2021). Specifically, in *Meindertsma*, Ethicon argued that Dr. Rosenzweig's opinions were unreliable because there was no evidence that degradation, deformation, rigidly, fraying, and other characteristics existed in the specific device that the surgeon implanted. *Id*. The court disagreed. *Id*. The court held that although Dr. Rosenzweig did not personally examine the mesh or the plaintiff, his differential diagnosis was reliable and that Ethicon's challenges were to the weight of the opinion. *Id.*

Similarly, in the instant matter, Dr. Rosenzweig discussed the conditions he was able to rule out and established a basis for ruling in the characteristics of the mesh that causes the type of injuries that Plaintiff allegedly suffered. Defendants' challenges may be raised during their cross examination of Dr. Rosenzweig. Accordingly, the Court finds that Defendants' arguments are not well taken, and the Motion on this issue is **DENIED**.

### 3. Knowledge of Implanting Physician

Defendants argue that Dr. Rosenzweig should be precluded from speculating on what Plaintiff's implanting physician knew prior to surgery. Defendants argue that whether Plaintiff was able to make a fully informed decision is irrelevant given the claims asserted here. Further,

12

Defendants argue that Dr. Rosenzweig's opinions are impermissible state-of-mind testimony that are purely speculative and inadmissible. Defendants argue that the MDL court consistently precluded physicians from offering similar opinions.

Plaintiff states that Defendants have inaccurately characterized Dr. Rosenzweig's opinion as a state of mind opinion, but Dr. Rosenzweig opines about the adequacy of the Prolift warnings. Plaintiff states that Dr. Rosenzweig is not attempting to tell the jury what is in Plaintiff's mind or the mind of the implanting surgeon.

Defendants reply that Dr. Rosenzweig's state of mind opinion should be excluded. Defendants state that the jury is capable of listening to Plaintiff's implanting surgeon's testimony and reach its own conclusions about the state of his knowledge when he was making the prescribing decision.

In the present matter, Dr. Rosenzweig opines as follows:

> Ms. Ratliff was not able to make a fully informed medical decision regarding the implantation of the Prolift mesh because Ethicon failed to fully disclose the risks and complications (both early and late) in the Prolift Instructions for Use. As discussed above, and elsewhere in this report, Ms. Ratliff did not receive information about the above risks because Ethicon did not disclose them fully in its IFUs, and surgeons, including the implanting surgeon in Ms. Ratliff's case, were not made aware of them. This is true despite information readily available to Ethicon about these risks, which predate the launch of the device. Because of this, Ms. Ratliff's implanting surgeon could not pass this information on to her and properly consent her about the risks associated with the Prolift device. Ms. Ratliff was unable to make a fully informed decision about having the device implanted. As a result, to a reasonable degree of medical certainty, Ms. Ratliff suffered injuries that were not disclosed by Ethicon, and the inadequate disclosure of these risks was a substantial factor and/or cause of Ms. Ratliff's injuries.
>
> Ms. Ratliff's implanting surgeon was not able to provide the necessary and required information to Ms. Ratliff for an informed

13

consent because Ethicon failed to fully reveal such information and failed to fully evaluate said information prior to launch.

[Doc. 83-2 at 34].

As mentioned above, Defendants challenge Dr. Rosenzweig's opinions that discuss Plaintiff's implanting physician's knowledge and state of mind, while Plaintiff responds that Dr. Rosenzweig is qualified to opine on the inadequacy of the warnings that accompanied the Device. The Court finds that Dr. Rosenzweig cannot offer testimony about the awareness or knowledge of Dr. Laing, the implanting physician. *See Bell v. Ethicon Inc.,* No. 4:20-CV-3678, 2021 WL 1111071, at *8 (S.D. Tex. Mar. 23, 2021) (excluding Dr. Rosenzweig's testimony regarding what the implanting surgeon knew or did not know at the time of plaintiff's surgery); *Nall v. C. R. Bard, Inc.,* No. 2:13-CV-01526, 2018 WL 524632, at *2 (S.D.W. Va. Jan. 23, 2018) ("The defendant argues that I should preclude Dr. Rosenzweig from testifying as to the state of mind of the plaintiff and Dr. Foster, her implanting physician. I agree; experts may not testify about what other parties did or did not know."). The Court finds that the jury can evaluate Dr. Laing's testimony about his knowledge of the risks at the time of Plaintiff's implant procedure.[1] Accordingly, the Court finds that Defendants' request is well taken, and the Motion on this issue is **GRANTED**.

4.  **Legal Conclusions**

Defendants object to Dr. Rosenzweig's statement that Plaintiff has suffered and will continue to suffer damages. Defendants argue that this statement is a legal conclusion and that the MDL court already held that the experts cannot render legal conclusions. Plaintiff responded that Dr. Rosenzweig does not intend to offer the above statement at trial. Accordingly, given Plaintiff's

---

[1] Defendants also argue that whether Plaintiff was able to make a fully informed decision is irrelevant given the claims asserted here, but Defendants do not explain this argument.

14

representation, the Court finds Defendants' argument moot, and the Motion on this issue is **DENIED AS MOOT.**

### 5. Reasonableness and Necessity of Plaintiff's Medical Charges

Defendants request that the Court preclude Dr. Rosenzweig's opinion on the reasonableness and necessity of Plaintiff's medical charges. Defendants argue that Dr. Rosenzweig's opinion is conclusory and that Dr. Rosenzweig is based out of Chicago, Illinois, and does not have knowledge of the market in which Plaintiff received her care.

Plaintiff states that there is no legal authority for excluding Dr. Rosenzweig's opinions regarding the reasonableness and necessity of Plaintiff's medical charges. Plaintiff states that Defendants can cross examine Dr. Rosenzweig's opinions.

In the present matter, Dr. Rosenzweig states that he has reviewed Plaintiff's medical bills and that he "feel[s] that they were reasonable and necessary charges to treat the complications and injuries that, to a reasonable degree of medical certainty, were caused by the Prolift device . . ." [Doc. 83-2 at 36].

In *Dedmon v. Steelman*, the Supreme Court noted that in order for a plaintiff to recover past medical expenses, a plaintiff must show that the medical bills paid or accrued were both "necessary and reasonable." 535 S.W.3d at 438 (other citations omitted). "In all but the most obvious and routine cases, plaintiffs must present competent expert testimony to meet this burden of proof." *Borner v. Autry*, 284 S.W.3d 216, 218 (Tenn. 2009). "To be qualified to render these opinions, the physician must first demonstrate (1) knowledge of the party's condition, (2) knowledge of the treatment the party received, (3) knowledge of the customary treatment options for the condition in the medical community where the treatment was rendered, and (4) knowledge

15

of the customary charges for the treatment." *Dedmon*, 535 S.W.3d at 438 (quoting *Long v. Mattingly*, 797 S.W.2d 889, 893 (Tenn. Ct. App. 1990)).

In *Nash v. Carter*, the Tennessee Court of Appeals held that "an out-of-town referring physician could not testify to the reasonableness of the charges of a hospital where he does not practice or the charges of physicians in a city where he does not practice." No. 87-192-II, 1987 WL 19312, at *6 (Tenn. Ct. App. Nov. 4, 1987); *see also Ford v. Markert*, No. 01A01-9404-CV-00185, 1995 WL 1693, at *3 (Tenn. Ct. App. Jan. 4, 1995) ("Dr. Lamb's testimony unequivocally establishes that he is not familiar with the customary treatment options and charges relating to [plaintiff's] condition in the medical communities of Dodge City or Garden City, Kansas or Paducah, Kentucky. Hence, he was not qualified to render an opinion as to the necessity of the services provided and the reasonableness of the charges incurred. We conclude that the admission of this testimony was harmful error."); *compare Long v. Mattingly*, 797 S.W.2d 889, 894 (Tenn. Ct. App. 1990) (finding both physicians were competent to testify to the reasonableness of the charges because they were familiar with the charges of the treatment plaintiff received and within the area where plaintiff received such treatment).

In the instant matter, there is no evidence before the Court that Dr. Rosenzweig is familiar with the reasonableness and necessity of Plaintiff's medical charges within the community where she was treated. During oral argument, Plaintiff stated that Dr. Rosenzweig has treated patients across the country, but the Court has no evidence that he is familiar with the medical charges where Plaintiff was treated. Accordingly, the Court finds Defendants' argument well taken, and the Motion on this issue is **GRANTED**.

16

B.  Dr. Speights

Dr. Speights is a urogynecologist who is board-certified in obstetrics, gynecology, and female pelvic medicine and reconstructive surgery.  Defendants retained Dr. Speights to provide case-specific opinions about the Device and the cause of Plaintiff's injuries.

Plaintiff moved to exclude the following opinions because they were not disclosed in Dr. Speights's expert disclosure:

> (1) the adequacy of the relevant Instructions for Use ("IFU"), or what warnings those IFUs should or should not include, because he failed to disclose such opinion and he is not qualified in that area of expertise; and
>
> (2) that the complication rates of the patients in his own clinical practice are "rare" or otherwise uncommon, because he failed to disclose such opinion and his opinion is speculative and without foundation.

Defendants state that that the above opinions were given in response to questions Plaintiff asked Dr. Speights at his deposition.  Defendants state that Dr. Speights will not testify generally to the adequacy of the product IFU or to his personal complication rates from his use of Prolift.

Plaintiff replies that Defendants are vague in what Dr. Speights intends to testify.  Plaintiff agrees that Dr. Speights's clinical experience is part and parcel of the foundation of his opinions, but Plaintiff asserts that he should not be permitted to testify to a complication rate that he sees in his patients or that complications are rare or uncommon.

During the motion hearing, Defendants stated that they are not offering specific complication rates.  Defendants stated that it appears Plaintiff objects to Dr. Speights's use of the word "rare" when describing his personal experience as related to complication rates with the Device.  *See also* [Doc. 94] (Plaintiff's reply) (arguing that Dr. Speights cannot testify that complications are "rare" or "uncommon").

17

The Court finds Plaintiff's argument not well taken. Defendants confirmed that they do not intend to illicit the testimony objected to above. While Plaintiff also objects to Dr. Speights's use of the words "rare" or "uncommon" in relation to his experience with complications from using the Prolift, the Court will not exclude Dr. Speights's from using specific words to describe what he has seen in his clinical practice. *See* [Doc. 85-1 at 3] (Dr. Speights's expert report discussing that he bases his opinions, in part, from his experiences in fellowship and practice). Accordingly, the Court **DENIES** Plaintiff's Motion [**Doc. 85**].

### IV. CONCLUSION

Accordingly, Defendants' Motion to Limit the Case-Specific Opinions of Bruce Rosenzweig, M.D. [**Doc. 83**] is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's Motion to Exclude Certain Opinions and Testimony of Steven Edwin Speights, M.D. [**Doc. 85**] is **DENIED.**

**IT IS SO ORDERED.**

ENTER:

_____
United States Magistrate Judge

18

Case 2:20-cv-00142-KAC-HBG   Document 107   Filed 09/21/21   Page 18 of 18   PageID #: 990